**FILED**

FEB 03 2016

Clerk, U.S. Courts
District Of Montana
Missoula Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

PETER EARL CASWELL,

Petitioner,

vs.

LEROY KIRKEGARD; ATTORNEY
GENERAL OF THE STATE OF
MONTANA,

Respondents.

Cause No. CV 14-47-M-DLC-JCL

FINDINGS AND
RECOMMENDATION OF UNITED
STATES MAGISTRATE JUDGE

On February 27, 2014, Petitioner Peter Caswell filed this action under 28

U.S.C. § 2254. Caswell is a state prisoner represented by Assistant Federal

Defender David F. Ness. On October 15, 2014, Caswell filed an Amended Petition.

(Doc. 29). On March 6, 2015, the State was ordered to file an Answer to Caswell's

Amended Petition. (Doc. 30). On May 13, 2015, the Answer was filed (doc. 36);

Caswell filed his Reply on June 5, 2015 (doc. 40). This matter is ready for

adjudication.

## I.    Procedural History

On March 3, 2011, following a three-day jury trial in Montana's Nineteenth

Judicial District, Lincoln County, Caswell was convicted of sexual intercourse

without consent, a felony, and partner/family member assault, a misdemeanor. The

victim of Caswell's transgressions was his wife, Beth. Caswell was acquitted of

1

one count of burglary and was sentenced to the Montana State Prison for a period of sixty years without the possibility of parole.

Following the trial court's denial of his motion for a new trial, Caswell filed a direct appeal with the Montana Supreme Court. See *State v. Caswell*, 2013 MT 39 (Not. filed Sept. 9, 2011). Apparently, while preparing the trial transcript for appeal, it was discovered that approximately fifteen minutes of testimony from investigating officer Captain Bo Pittman had not been recorded by the court officer charged with recording the trial proceedings with an audio recording device.

Upon discovery of this deficiency the trial court, in accordance with Rule 8(7)(D) of the Montana Rules of Appellate Procedure, issued an Order for Statement which provides for supplementation of the record, "[i]f a trial or other proceeding was not reported in whole or in part, or if a transcript is otherwise unavailable." See *State v. Caswell*, 2013 MT 39 (Or. for Stmt. Filed Nov. 14, 2011). In response to this Order, the State filed a statement of recollection derived from "the prosecutor's handwritten trial notes, the recording log, exhibit logs, the partial transcript and a consultation with Captain Pitman." *State v. Caswell*, 2013 MT 39, ¶ 11 (Or. filed Feb. 19, 2013). The State also identified 30 photographs admitted through Pitman and summarized Caswell's cross-examination of Pitman, including reference to a prior 2009 partner/family member assault arrest. *Id.* Defense counsel informed the court that he did not have an independent

recollection of the testimony following a nine-month time lapse, but believed objections were made during Pitman's direct exam that were not referenced by the State. *Id.* Caswell himself submitted a summary of topics he believed were covered by Pitman, including: a statement that Caswell was not drinking and was cooperative and forthcoming during the investigation and that Ian and Beth Caswell lied in their testimony. *Id.* Ultimately, the trial court issued an Order Adopting Statement of Unavailable Evidence Under Rule 8(7)(D) M.R. App.P to which Caswell objected. Caswell's objection was denied and the Order and Statement was lodged with the Montana Supreme Court. See *State v. Caswell*, 2013 MT 39 (Or. Adopting Stmt. Filed January 10, 2012). The trial transcript, including the reconstructed portion, was subsequently filed in the Court.

On June 18, 2012, Caswell filed his opening brief arguing that the missing record of a crucial state's witness and the trial court's ineffectual attempts to reconstruct the record violated Caswell's right to due process. See *State v. Caswell*, 2013 MT 39 at 1 (Br. filed June 18, 2012). Caswell also argued the trial court erred by allowing the State to present evidence regarding a 2009 partner/family member assault at trial. *Id.*

Citing *Britt v. North Carolina*, the Montana Supreme Court outlined the two-part criteria used to determine whether a court's failure to record a portion of the trial violated a defendant's right to due process under the Fifth Amendment: (1)

3

the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." *State v. Caswell*, 2013 MT 39, ¶ 18, citing *Britt v. North Carolina*, 404 U.S. 226, 227 (1971). The Court reasoned that under *Britt's* first prong, Caswell must "identify a tenable theory as to what the [recording] error might have involved. *Id.* at ¶19, citing *Madera v. Risley*, 885 F. 2d 646, 648 (9th Cir. 1989). The Court noted that in *Madera* the trial court did not record voir dire, opening statements, closing arguments, bench conferences, the jury charge, or the jury poll. But, the defendant in *Madera* was able to meet the first prong of *Britt* by claiming that he needed the complete record in order to discern whether or not his co-defendant's alibi defense provided him with a cognizable appellate issue. *Id.*, citing *Madera*, 885 F. 2d at 648. The Montana Supreme Court found that, like *Madera*, Caswell identified a tenable theory as to what Pitman's testimony involved, his recollection of events on the night in question, as well as the 2009 event which Pitman also investigated. And he effectively established "the value of the transcript" under *Britt's* first prong. *Id.* at ¶ 20, citing *Britt*. 404 U.S. at 227.

Turning to the second prong of *Britt* the Court held that the record was sufficiently complete for appellate review and that Caswell's due process right was not violated. *Id.* at ¶23. In arriving at this conclusion, the Court noted that

alternative devices may be employed in lieu of a transcript:

> Alternative methods of reporting trial proceedings are permissible if they place before the appellate court an equivalent report of the events at trial from which the appellant's contentions arise. A statement of facts agreed to by both sides, a full narrative statement based perhaps on the trial judge's minutes taken during trial or on the court reporter's untranscribed notes, or a bystander's bill of exceptions might all be adequate substitutes, equally as good as a transcript.

*Id.* at ¶ 21, citing *Draper v. Washington*, 372 U.S. 487, 495 (1963); *Madera*, 885 F. 2d at 649. The Court found the trial court properly invoked Rule 8 of the Montana Rules of Appellate Procedure and followed the method prescribed for reconstruction of the trial record in the event of an unavailability. *Id.* at ¶ 22. In reconstructing the missing portion of the record, the trial court looked to "the State's statement of Unavailable Evidence, the Defendant's Response, the partial transcript of the available recorded testimony of Captain Bo Pitman, the recording log, and the exhibits introduced into evidence at trial." *Id.* at ¶ 23. Upon review, the Court found that the reconstructed record, taken as a whole, presented a "fair and accurate picture" of what occurred during Pitman's omitted testimony. *Id.* No due process violation occurred.

## II.    Factual Background

Prior to trial, defense counsel sought to exclude any testimony or evidence related to Caswell's 2009 conviction for an assault upon his wife, Beth. Defense counsel argued the State was offering information relating to the 2009 assault to

5

impermissibly prove Caswell's character for violence and conformity therewith and that the potential prejudice outweighed the probative value. *Id.* at 3. The State countered that the information was central to the issue of consent: Beth didn't resist because she'd been assaulted by Caswell previously. *Id.* Also, the State asserted the information was probative of the apprehension prong to the partner/family member assault charge. The theory being that Beth had reasonable apprehension of injury from Caswell because she'd been victimized by him a year and a half prior. *Id.* Finally, the state theorized that the prior assault information was relevant to the burglary charge. Following the 2009 assault, Caswell and Beth were separated and Caswell ceased residing at their residence. Because the 2009 assault was the impetus for Caswell and Beth living apart, the State argued that this went to the heart of the issue of whether he entered the residence or remained unlawfully. *Id.* at 6.

Ultimately, the trial court held that the evidence and testimony regarding the 2009 assault including a 9-1-1 call and photographs were admissible. The trial court excluded, however, law enforcement interviews, Beth's handwritten statement, and her recorded statement. *Id.* at 7-8. The trial court reasoned that so long as the testimony went to the issue of whether or not there was consent for the sexual encounter it was admissible. *Id.* at 10.

The trial court made clear there was to be no mention of the fact Caswell

was actually convicted of the assault. *Id.* at 8; 10. In fact, the court specifically admonished Officer Pitman, who happened to be present during the motions hearing, not disclose Caswell had a previous conviction:

> The Court: Caution the deputy not to say anything about convictions. Okay. Because—well, you can see why. Nothing about the conviction unless I allow it. If you say you investigated, etcetera, just don't- I'm speaking to Deputy Pitman. I gather you are Deputy Pitman, correct?
>
> Pitman: Yes, sir.
>
> The Court: Since you are nodding when I say that. Just be careful with that.

*Id.* at 11.

At trial the State called: Officer Bo Pitman, Ian Caswell, Detective Duane Rhodes, and Beth Caswell in its case-in-chief. The sole defense witness was Caswell himself. The State called the Caswell's oldest son, Jeff Caswell, as a rebuttal witness.

### a. Testimony of Officer Pitman

Officer Pitman testified that he first came into contact with both Peter and Beth Caswell in March of 2009 when he was called to investigate an assault complaint Beth lodged against Peter. (Doc. 36-2 at 60). Upon making contact with Beth at that time, Pitman observed apparent injuries including a black eye, a cut on the bridge of Beth's noes, and a split lip. *Id.* Photographs depicting those injuries were introduced into evidence.

As to the conviction under scrutiny here, Pitman testified that while on patrol the early morning of August 15, 2010, he responded to a dispatch concerning a sexual assault that was reported to have just occurred at the Caswell residence. Upon arrival at the Caswell residence, Pitman was met by Ian Caswell, one of Beth and Caswell's sons, who escorted him inside. Pitman then spoke with Beth Caswell who he described as "emotionally exhausted." *Id.* Beth described the events to Pitman and showed him around the residence. Pitman contacted Detective Rhodes, who was primarily responsible for handling sexual assaults, for guidance on the investigation. *Id.* at 65. After further discussion with Beth, and because Peter was still unaccounted for, Pitman drove Beth into the town of Eureka so that she could spend the night with her son Jeff. *Id.* at 66. Ian stayed back at the Caswell residence.

After leaving Beth in Eureka, Pitman received a dispatch advising Caswell had returned to the residence. *Id.* at 67. Pitman drove back to the Caswell residence; by this time it was 5:17 in the morning. Pitman could see Caswell sitting down inside the residence and ordered him to come outside. He then placed Caswell under arrest.

### b. Reconstructed Testimony of Officer Pitman

During the course of Pittman's trial testimony a recess was held, after which the court's audio recording device was not turned on. Consequently, between 15

and 20 minutes of Pitman's testimony went unrecorded. As set forth above, the Court attempted to reconstruct this missing testimony. *See generally*, Doc. 36-2 at 69- 72. Through Pitman, a number of photographs of the exterior and interior of the Caswell cabin and the surrounding area were admitted. *Id*. at 70.

During the reconstructed cross-examination, Pitman discussed Caswell's 2009 arrest. A booking photo was introduced that purported to show Caswell with injuries on his forehead. Pitman did not remember whether or not Caswell was injured during the 2009 incident. *Id*. at 71. Following that incident, Beth Caswell stated that she wanted Caswell to get help for alcohol abuse and mental health issues, including depression. *Id*. Beth did not want Caswell to be in legal trouble.

Regarding the August 2010 investigation, Pitman acknowledged that during his initial response to the Caswell residence, he did not take any photographs, did not collect the cell phone that was allegedly damaged during the assault, did not collect a flashlight that Beth purportedly used during the assault in an attempt to fend off Caswell, did not collect the bed sheets or Beth's pajama pants, and did not seize the personal computer from the cabin. *Id*. Pitman acknowledged Beth admitted to consuming one mixed drink during the evening, although he did not smell the odor of alcohol on either Caswell or Beth. *Id*. Pitman agreed that Caswell was cooperative with law enforcement. *Id*. There was no sign of forced entry into the cabin. Caswell was not armed and Pitman did not recall if he had

keys to the residence on him. *Id.* Pitman did not recall hearing or seeing any dogs during his interaction with Caswell. Pitman did not observe that the cabin's landline had been tampered with in any way. *Id.* at 72.

### c. Testimony of Ian Caswell

Ian Caswell testified that his cabin was situated some 100 yards from his parents' cabin. *Id.* at 74. He stated that both of his parents lived in the cabin until after Caswell's March of 2009 assault of Beth at which time only Beth resided there. Following the assault on Beth, Caswell no longer resided there. *Id.* at 76. Ian described his mother's injuries following the 2009 assault stating "it was 100 percent obvious she was beat up pretty badly." *Id.*

Ian testified that Caswell was gone from the Eureka area for approximately one year. Upon his return, he rented a place in town. *Id.* at 77. After an extended trip to the eastern United States in the summer of 2010, Caswell returned to Eureka and both Beth and Ian recalled that on the Wednesday prior to the sexual assault, Caswell joined Beth and Ian for dinner at Beth's home. *Id.* at 79. Following dinner, Caswell and Beth began arguing; Caswell wanted Beth to take him back while Beth remained steadfast in her desire to be divorced. *Id.* The argument moved outside from inside the residence, Ian monitored the argument and testified Caswell became very agitated and upset. While Ian could not make out the words being said, he described his father as "very loud" and noted that the argument

10

ended with Caswell slamming the door to his pickup.

Ian left his mother's residence shortly after the argument. When he returned he noticed her suburban parked in an unusual manner in front of the cabin and found the cabin door locked. *Id.* at 80. Once in the cabin, Ian found Beth upset and frightened. He then decided to stay the night on her couch. *Id.*

Ian testified that late the following Saturday night or early Sunday he received a call from his upset mother, asking him to come over. *Id.* at 81. Ian retrieved a flashlight and his handgun and ran from his cabin to Beth's. *Id.* En route to his mother's, Ian observed his father's pickup driving slowly down the road away from his mother's house with only the running lights activated. *Id.* at 82. When Ian arrived he found Beth visibly upset. She told him generally what had occurred. *Id.* Ian stated Beth told him Caswell had forced himself on her sexually. *Id.* at 88. Ian waited with her until Pitman arrived and took Beth away from the residence. Ian elected to wait at Beth's residence to see if Caswell would return. *Id.* at 82.

Ian testified that a couple hours later, Caswell drove toward the residence with his headlights off. *Id.* at 83. Ian exited out the side door of the cabin and called dispatch, meanwhile, Caswell beat on the front door and repeatedly hollered Beth's name and "let me in." *Id.* at 84. Caswell eventually entered the house and Ian remained outside to avoid a confrontation with his father.

On cross-examination, Ian stated it was understood following the 2009 assault that Caswell was not welcome on the property. *Id.* at 88. He always called before he came. *Id.* And Ian testified that whenever his father came onto the property, following the 2009 assault, Ian made a point to be present at his mother's residence so as not to leave her alone with Caswell. *Id.* at 91.

### d. Testimony of Detective Duane Rhodes

Detective Rhodes testified that Pitman called him from the scene on August 14, 2010, seeking advice on conducting the sexual intercourse without consent investigation. *Id.* at 94. And Rhodes advised him to have Beth go for a rape examination the following day. *Id.* at 95. On Sunday morning Rhodes interviewed Caswell at the Sheriff's Office. Caswell admitted having intercourse with Beth, although he claimed it was consensual. *Id.* at 96. Rhodes made contact with Beth who was then travelling into Kalispell to have the examination and advised her that it would not be necessary since Caswell had admitted that they had sex. *Id.* at 95. Rhodes wanted to spare Beth the trauma associated with the examination. *Id.* at 96.

During his interview of Beth, she disclosed that while trying to fend off Caswell, she bit him on the shoulder. Rhodes then interviewed Caswell a second time. Rhodes asked Caswell to remove his shirt during the interview and observed what appeared to be a bite mark on his right shoulder. *Id.* at 97. A photograph of

this injury taken by the jail staff at Rhodes' direction was admitted into evidence. *Id.*

During his interview Caswell stated that he slapped Beth's cell phone out of her hands because it irritated him that she was texting rather than paying attention to him. *Id.* at 99. On cross-exam Rhodes conceded that a rape kit could show other things aside from whether or not intercourse had occurred, such as bruising or vaginal injuries. *Id.* at 100-101. And that a breath test was not administered to Beth on the early morning of August 15, 2010. *Id.* at 102. Rhodes also acknowledged that he did not seize any physical evidence or take any photos at Beth's residence when he initially interviewed her on August 16, 2015. *Id.* Rhodes testified Beth stated that in relation to the sex that she "kind of went along with it." *Id.* at 104. On redirect Rhodes clarified his understanding of this statement was not that Beth willingly went along with the entire encounter, but rather that she "gave up fighting him." *Id.*

### e. Testimony of Beth Caswell

Beth Caswell testified that she had not lived with Caswell since the March 2009 altercation and that Caswell never spent a night since that time. *Id.* at 106-7. She also relates she and Caswell had not engaged in any sexual relations from March of 2009 to the night of the August 2010 incident. *Id.* at 107. And that since the 2009 altercation she had been pursuing a divorce. *Id.* at 108.

Beth testified that when Caswell told her he was returning to Eureka, she made an appointment with a pro-bono lawyer in Libby in order to get the divorce moving forward. *Id.* at 109. The appointment was scheduled for August 18, 2010. *Id.* Caswell made it clear to Beth that he wanted to stay married. Beth observed that his attitude toward the divorce had changed; Caswell accused her of not paying attention to the positive changes he had made in his life. *Id.* at 111.

Beth stated that upon his return to Eureka on Wednesday, Caswell came to the cabin to drop off his dog. Because it was time for dinner, she asked Caswell to join her and Ian. Following the meal, Caswell began again to try and persuade her to stay married; Beth refused. *Id.* Caswell asked her to accompany him outside to talk further. Ian remained in the house. While outside, Caswell became very frustrated and at one pointed jumped out of his vehicle toward Beth raising his voice at her in frustration. *Id.* He went inside, retrieved his dog, and left the property. *Id.*

Concerned that Caswell might return, Beth had Ian spend the night. Contrary to her ordinary practice, she also locked the doors. During the middle of the night, Caswell called and left a message advising Beth to "hang on" because they were "going for a ride." Beth deleted this message. *Id.* The following morning, Thursday, Caswell called and apologized for his behavior and Beth obliged his request that he leave his dog at the cabin while he traveled to Helena

and Billings. *Id.* at 114.

On Friday, Caswell called Beth and advised her to cancel her appointment with the attorney because he was not going to be signing any divorce papers. *Id.* at 115. Believing Caswell would not return that evening from Billings or Helena, Beth did not have Ian stay at the cabin. After Ian left, Beth was watching TV when she felt a hand on her shoulder. Caswell had returned. *Id.* at 116.

According to Beth's testimony, the following events occurred. Startled, Beth immediately got out of her seat. Caswell took her place and asked Beth to sit back down, but she refused. *Id.* at 117. Caswell ignored Beth's request that he leave. *Id.* at 118. The two eventually moved toward the kitchen area of the cabin. Caswell told Beth that he had a gun and he intended to kill himself, but that he wanted to make love to her one last time. *Id.* at 119. When Beth indicated her unwillingness to engage in sexual activity, Caswell retorted, "that's right, I'm going to 'F' you." *Id.*

Caswell over Beth's resistance, including biting him on the shoulder, forced her into the bedroom and forcibly removed her pajama bottoms and ordered her to remove her top. When Caswell momentarily left the room, Beth attempted to retrieve her cell phone to call for help. But before she could do so, Caswell returned, knocked the phone out of Beth's hands and told Beth he had cut the landline. *Id.* at 121. Beth made a futile effort and hit Caswell.

Caswell forced Beth to perform oral sex on him and he penetrated her both vaginally and anally. Finished with his sexual assault, Caswell ordered Beth to get dressed so that they could talk. *Id.* at 122.

When Beth approached Caswell in the kitchen he asked her if she would like him to call the sheriff. *Id.* Unsure of what he would do next, she told him no. Caswell asked if he could come back to the cabin later on. Wanting to get him out of the residence, Beth assented saying that he could return, but not until later in the day. *Id.* After Caswell eventually left, Beth locked the doors and shut off the interior lights off and called 9-1-1 on her landline which had not, in fact, been cut. *Id.* at 122-23. 9-1-1 Dispatch directed Beth to have Ian over and wait while the deputy responded. While on the phone with dispatch, Beth observed Caswell's truck leave the drive with just the running lights on. *Id.* at 123. Ian came to the residence and waited for Pitman to respond.

After Beth related the events to Officer Pitman and showed him around the cabin, Pitman drove Beth into Eureka to stay with her son, Jeff. Id. at 124. The next morning when Beth and Jeff were en route to the examination, Beth was advised by law enforcement that she did not need to proceed with the examination because Caswell had admitted that he had sex with Beth the night before. *Id.*

Beth ultimately acknowledged leading up to the 2009 assault, she and Caswell were both drinking. *Id.* at 127-8. She also acknowledged that during the

16

2010 assault, she did not see a gun on Caswell and that he did not hit her. *Id.* at 130.

### f. Testimony of Peter Caswell

According to Caswell, at the time of the 2009 assault, both he and Beth had been drinking heavily and that when Beth began hitting him in the face, he hit her back. *Id.* at 135-6.

Caswell testified that it was not until June of 2010 that he knew Beth wanted a divorce, even though they had not lived together since March of 2009. *Id.* at 138-9. When Caswell returned to Eureka in the spring of 2010 he rented his own place. Caswell then embarked on his road trip, prior to his return he contacted Beth to let her know he would be back. Caswell didn't think she seemed upset. *Id.*

Contrary to Ian and Beth, Caswell stated that he didn't arrive at the cabin at dinner, but at some time between 2:00 and 2:30 in the morning on Wednesday, August 11, 2010. According to Caswell the following events transpired. He sat in his truck until 6:00 a.m., at which point he went in and had breakfast with Beth. *Id.* at 141. Caswell claims that before he left that morning to do errands, Beth invited him back for dinner that evening. *Id.* At dinner, there was no conversation about divorce and he did not get upset with Beth. *Id.*

Caswell then traveled to Billings on Thursday, August 12 and to Helena on Friday, August 13th. On Friday night, he traveled to Libby and rented a motel

room. *Id.* On Saturday morning, he traveled into Idaho and Saturday night he traveled back to Beth's cabin. *Id.* Caswell admitted he did not call ahead to let Beth know he would be coming over that night.

Contrary to both Ian and Beth, Caswell claims that he drove right up to the front of the house with his headlights on. *Id.* at 142. As he approached the front door, he could see Beth through the front window smiling. After he entered the house, Beth did not ask him to leave. After fifteen to twenty minutes and cordial conversation they began hugging in the kitchen and eventually moved toward the bedroom where they engaged in consensual vaginal, oral, and anal sex. *Id.* at 144-5.

Afterward, Beth came to the kitchen and handed Caswell divorce papers to sign. But Caswell refused to sign them because he believed that she and Ian were scheming to defraud him of his interest in the property. *Id.* at 145. Caswell admitted he became angry when he saw Beth texting and knocked the phone out of her hand. Caswell didn't recall Beth biting him. *Id.* at 145-6. When Caswell decided to leave at about 1:30 in the morning, Beth asked him to return at 8:00 a.m. so they could continue to discuss a divorce. *Id.* at 146. Caswell stated that he could not remember exactly when he returned to the property, but shortly after his arrival he was placed under arrest by Pitman. *Id.* at 147.

On cross examination, Caswell testified to the following matters. He

18

conceded that during the period of his separation with Beth, from March 2009 to August 14, 2010, he and Beth had not had sexual relations. *Id.* at 149. Caswell acknowledged that he had made no mention of having breakfast with Beth on August 11th to Detective Rhodes, because he didn't think that detail was important. *Id.* at 154. He had dinner with Beth and Ian on Wednesday night. *Id.* Caswell couldn't recall if Beth bit him on the shoulder or if she tried to hit him with a flashlight when they were in the bedroom. *Id.* at 155. Caswell admitted that he had no right to remove the cell phone from Beth's hands. *Id.* Caswell also stated that he had been in a good state of mind until Beth brought up the divorce; that is when he became angry and knocked the phone away from her. *Id.*

Caswell stated that following their argument in the early morning hours of August 15th, Beth asked him to return between 8:00 a.m. and 9:00. He conceded that he returned earlier than requested, sometime between 3:00 and 5:00 a.m. *Id.* at 159. Caswell denied beating on the front door or yelling Beth's name upon his return. *Id.*

Caswell stated that after he knocked the cell phone out of Beth's hands he asked her if she wanted to call the sheriff. *Id.* at 161. Caswell stated that the only thing he did wrong that night was knocking the phone out of Beth's hand and that he never laid a hand on her. *Id.* Caswell suggested Beth may want to call the police because he may have made her uncomfortable by taking away her cell

19

phone. Caswell did not believe Beth had any reason to feel unsafe. Caswell agreed that even if she had called the sheriff, it would have taken 45 minutes for an officer to arrive. *Id.*

Caswell stated he did not have keys to Beth's cabin. *Id.* at 163. He also claimed that the only time he and Beth discussed a divorce was after they'd had consensual sex and she asked him to sign the divorce papers, essentially the divorce discussion was a surprise to him. *Id.* at 165.

### g. Testimony of Jeff Caswell

As a rebuttal witness, the State called Jeff Caswell. He stated that in the early morning hours of August 15, 2010, his mother arrived at her house and was very upset. Her hair was messed up, she didn't look good, and she had been crying. *Id.* at 166. The next morning, between 8:00 and 9:00 a.m., Jeff began driving his mother into Kalispell for the rape exam. They made it 15 miles out of Eureka before they were called back and advised that the exam would not be necessary. *Id.*

### III.   Caswell's Claims

Caswell asserts that his right to due process was violated when crucial portions of Officer Pitman's testimony were not recorded and that the summary statement of the missing testimony is inadequate for appellate review. (Doc. 29 at 19).

# IV.  Analysis

## a.  AEDPA Deference

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. *Lindh v. Murphy*, 521 U.S. 320, 326, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997).  The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. at 375 n. 7 (2000).  Under Section 2254(d), a state prisoner whose claim has been "adjudicated on the merits" cannot obtain federal habeas relief unless that adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  See also *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 784, 178 L. Ed. 2d 624 (2011) ("By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2).").

A state court decision is "contrary" to clearly established United States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that is materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a result different from the Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002)(quoting *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)).

A state court decision is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," where the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the Petitioner's case. *Williams*, 529 U.S. at 413. However, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' …and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, __ U.S. __, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010). The standard is " 'difficult to meet,'" and a "petitioner carries the burden of proof." *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d

22

557 (2011).

### b. Parties' Contentions

The Ninth Circuit has held that *Britt* criteria apply in evaluating a habeas petitioner's claim that an incomplete or reconstructed record was inadequate for an effective appeal. *Madera v. Risley*, 885 F. 2d 646, 648 (9th Cir. 1989) (adopting *Britt* standard and noting, "[t]here is no Supreme Court or Ninth Circuit authority on the due process implications of a state court's failure to record portions of a criminal trial."). Both parties agree that the Montana Supreme Court properly applied the two-prong test of *Britt v. North Carolina* to the present case. (See Doc. 29 at 2; see also Doc. 36 at 18).

Caswell contends the Montana Supreme Court's merits adjudication of his claim resulted in a decision that was based upon an unreasonable determination of the facts. (Doc. 29 at 24). Caswell argues that without providing a fair opportunity to voice his objections to the reconstructed record, the process and the ensuing decision resulted from a defective process. *Id.*, citing *Murray v. Schiro*, 745 F. 3d 984, 999 (9th Cir. 2014). Caswell also asserts that the procedure employed by the trial court resulted in an unreasonable application of *Draper v. Washington*, 372 U.S. 487 (1963), *Britt v. North Carolina*, and *Mayer v. City of Chicago*, 404 U.S. 189, 193-94 (1971).

Conversely, the State contends the Montana Supreme Court correctly

23

applied *Britt* and reasonably concluded that the reconstructed record was sufficiently complete for Caswell to perform an appellate review. (Doc. 36 at 19). The State goes on to argue that even if Caswell were able to demonstrate that the Montana Supreme Court's adjudication was objectively unreasonable, he cannot demonstrate actual prejudice. *Id.* at 24-29.

### c. Application of Federal Law

"The federal constitution imposes on the States no obligation to provide appellate review of criminal convictions." *Halbert v. Michigan*, 545 U.S. 605, 610 (2005). When a state chooses to provide for appellate review, however, the state must provide a defendant with "a record of sufficient completeness to permit proper consideration of (his) claims." *Mayer v. City of Chicago*, 404 U.S. 189, 193-4 (1971)(quoting *Coppedge v. United States*, 369 U.S. 438, 446 (1962)); see also *Britt v. North Carolina*, 404 U.S. 226, 227 (1971) ("there can be no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when the transcript is needed for an effective defense or appeal.").

The United States Supreme Court first analyzed the adequacy of the disputed record in *Griffin v. Illinois*, where it held that a "record of sufficient completeness" does not automatically mean a verbatim transcript and that a State "may find other means (than providing sternographic transcripts for) affording adequate and effective appellate review to indigent defendants." *Griffin v. Illinois*, 351 U.S. 12,

24

20 (1956). In *Draper v. Washington*, the Court further explained:

> Alternative methods of reporting trial proceedings are permissible if they place before the appellate court an equivalent report of the events at trial from which the appellant's contentions arise. A statement of facts agreed to by both sides, a full narrative statement based perhaps on the trial judge's minutes taken during trial or on the court reporter's untranscribed notes, or a bystander's bill of exceptions might all be adequate substitutes, equally as good as a transcript.

*Draper v. Washington*, 372 U.S. 487, 495 (1963). As discussed above, and as the parties agree, the need for a transcript on appeal depends upon: (1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as the transcript. *Britt*, 404 U.S. at 433-34.

In the Ninth Circuit, the *Britt* criteria apply to the evaluation of a habeas petitioner's claim that reconstruction of an unrecorded portion of a state trial was inadequate for petitioner to take an effective appeal. *Madera v. Risley*, 885 F. 2d 646, 648 (9th Cir. 1989). Caswell has the burden of establishing prejudice from the lack of a complete transcript in light of the alleged value of the transcript and the availability of alternatives that would fulfill the same functions. *Id.* at 648-49 (petitioner not entitled to habeas relief because he had not shown prejudice by the absence of a complete transcript).

In the instant case Caswell argues that Pitman played a crucial role in the investigation of both the 2010 and the 2009 charges. He was the first to investigate

the rape allegation and the first law enforcement officer to examine the cabin where the assault occurred. Caswell argues that Pitman's testimony regarding the 2009 arrest was highly contested, that he testified to the injures he observed to Beth's face, and that the photograph of Beth's injuries was introduced through Pitman. (Doc. 29 at 22). Caswell also argues that during the unrecorded portion of Pitman's direct exam, 29 exhibits were introduced and that trial counsel recalled registering some objections, but none were recorded. *Id.* Caswell argues that because the reconstructed summary contains no objections to these exhibits, it is inherently suspect.

The Court does agree that the introduction of testimony surrounding the 2009 assault was contentious, however, as set forth above, the trial court clearly delineated the parameters surrounding this testimony. The court even cautioned Pitman himself not to discuss the conviction. Furthermore, the record reveals that both the Court and the prosecution were extremely cognizant of not crossing these boundaries in relation to prohibited testimony or the introduction of hearsay statements of either Beth or Ian via Officer Pitman.

For example, during Pitman's testimony the court *sua sponte* admonished Pitman not to relate any hearsay statements from Beth. (Doc. 36-2 at 59). The prosecutor also of his own volition asked Pitman not to present any hearsay from Beth to the jury. *Id.* at 60. Likewise, the defense lodged an objection to Pitman's

testimony being non-responsive and introducing hearsay testimony regarding his investigation into the 2010 incident; the objection was sustained. *Id*. at 63. Again, the prosecutor specifically told Pitman that he was not to disclose any hearsay statements from either Beth or Ian made during the August 15, 2010, response to the Caswell cabin. *Id*. at 64. Without an objection from the defense, the Court stopped Pitman from introducing speculative testimony that was potentially hearsay regarding why Beth didn't want to stay alone after the assault on August 15, 2010. *Id*. at 66. A follow-up defense objection to hearsay was sustained. *Id*. And the prosecution *sua sponte* cautioned Pitman not to talk about what Caswell said to him during Caswell's arrest. *Id* at 68. The record reveals that all parties were on high-alert and attempted diligently to adhere to the ground rules established by the trial court regarding Pitman's testimony.

Caswell attempts to argue that because the photo of Beth's injuries following the 2009 assault (Exhibit 15) was introduced through Pitman, that is somehow prejudicial. (Doc. 29 at 22). The portion of the testimony relating to the introduction of the photo, however, was all on the record. Additionally, the trial court ruled during the pretrial motions hearing that the photo would be admissible. Defense renewed objection to photo of Beth's injuries from 2009 assault. *Id*. at 60. That objection was overruled. During trial, the photo was subsequently identified by Beth during her direct examination as the photo that Pitman took of her

following the 2009 assault. *Id.* at 108. Caswell has failed to demonstrate prejudice in relation to this photo or Pitman's testimony of the 2009 assault.

During Pitman's direct exam, the State sought to introduce Exhibits: 3, 4, 9, 10, 11, 12, 13, 14, 17, 18, 19, 20, 21, 22, 23, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 38, 40, and 45. These photos consisted of: view of Ian Caswell's cabin (Ex. 3); views of wooded area between Ian and Beth's cabins (Exs. 4, 13, 21, 22); various exterior views of Beth's cabin (Exs. 9, 10, 11, 12,17, 18, 19, 20, 23, 25 ); the area beyond Beth's cabin (14); interior views of Beth's cabin (Exs 27, 28, 29, 30, 31, 32, 33, 34, 35, 38, 40, 43); and a view of Beth's cell phone (Exs. 44 and 46). Upon the State's motion to introduce the group of photos, defense counsel asked for an opportunity to review the photos prior to their admission at which point the court took a 15 minute recess to allow counsel to review them. *Id.* at 69. It was when court resumed following this recess that the recording device was turned off and not turned back on.

Prior to the introduction of this group of photos, the defense had not objected to the introduction of State's Exhibits 1 and 2 which were aerial views of the Caswell property. *Id.* at 61-2. Caswell claims that some objections, although they were not specified, were raised to these photos and the failure to account for the objection in the reconstructed records is prejudicial. It is difficult to discern what such objections would have been, unless it was to the cumulative nature of

the photos. If objections were made, they were apparently overruled because all of the photos came into evidence. The defense actually used the Exhibit 18 during its cross-examination of Ian Caswell. *Id* at 91.

Presumably, the photos of the Caswell property could also have been introduced through Ian or Beth or even, potentially, Detective Rhodes, had they not been introduced via Pitman. There is no indication in the record of defense counsel attempting to clear up any misrepresentation contained in these photos through other witnesses. This Court does not see how anything prejudicial could have come from photos of the property. Additionally, defense counsel did not object to the introduction of the actual flashlight (Ex. 8) that Beth claimed she attempted to use to fight off Caswell during the assault. *Id.* at 68. This Court is hard-pressed to see, then, what the objection could have been to the admission of the photograph of the cell phone which all parties agreed was not broken, but which Caswell admitted knocking out of Beth's hand. Finally, defense counsel advised the Court that he had no objection to any of the items that had been admitted, including the photographs, going to the jury during deliberations. (Doc. 36-2 at 196).

Caswell also takes issue with the manner in which the unrecorded portion of the record was reconstructed; however, as noted by the Montana Supreme Court, the trial court followed the procedure outlined by the Montana Rules of Appellate

Procedure. Caswell argues that the summary of Pitman's testimony was essentially prepared by the State and that it was unlikely that the prosecutor could have taken detailed trial notes during the direct examination. It is undisputed, however, that Caswell and his trial counsel were both given an opportunity to weigh in on the summary of Pitman's testimony. While Caswell did provide more detailed information than defense counsel in response to the trial court's order regarding record reconstruction, this fact does not, in and of itself, make the process inadequate.

In a subsequent order, the trial court noted that the prosecutor's submission of Pitman's reconstructed testimony "comported entirely" with the court's memory of the unrecorded testimony. (Doc. 36-28 at 2). Further, the trial court held that Caswell's argument that the notes should contain some form of exonerating testimony was "based on nothing more than a fantasy." *Id.* The court observed the prosecutor was a diligent note-taker and that had some form of an exonerating statement made by Pitman been omitted from the prosecutor's notes, the court would have recalled the statement independently. *Id.* at 3. Following the same rationale, this Court believes that had such a statement been made, not only would defense counsel had recalled the statement when asked for assistance in reconstruction of the record, defense counsel also would have made argument about the potentially exonerating statement during closing argument. No such

reference exists. *See e.g.* (Doc. 36-2 at 189).

Finally, the crux of the issue in the criminal case came down to Caswell's testimony versus Beth's regarding events surrounding the assault, the vast majority of which had nothing to do with Officer Pitman. It is hardly surprising that both had divergent accounts of what occurred. There were certain details of Beth's testimony that were corroborated by Ian. These included: Beth and Caswell differed in their view of the marriage- Caswell wanted to stay married while Beth desired a divorce; Caswell became angry with Beth following dinner and the two argued about a divorce; Beth was upset and scared following this argument- even locking her doors and parking her vehicle in front of her cabin for safety; Caswell drove to the cabin and away following the assault without his headlights on; and, following the assault Caswell returned back to the cabin hours earlier than the agreed upon time again without his headlights on. Similarly, Detective Rhodes corroborated testimony that Beth was upset when she learned that Caswell intended to return to the Eureka area in 2010 following nearly a year of separation, because that is what Caswell told him. Detective Rhodes also observed the bite mark on Caswell's shoulder that Beth stated she made during her struggle with Caswell prior to the assault. In viewing the trial as a whole, Caswell cannot establish prejudice simply based upon the small unrecorded portion of Pitman's testimony.

Caswell has failed to demonstrate that the Montana Supreme Court's finding that "the record is of sufficient completeness to afford effective appellate review, particularly of the admission of evidence regarding the 2009 incident" was an unreasonable one. The Court's finding that Caswell's right to due process was not compromised should be afforded deference.

## V. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules governing § 2254 Proceedings. A COA should issue as to those claims on which a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Caswell has not made a substantial showing that he was deprived of a constitutional right. There are no close questions and there is no reason to encourage further proceedings. A certificate of appealability should be denied.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1. Mr. Caswell's petition should be DENIED and DISMISSED WITH PREJUDICE; his claim is without merit.

2. The Clerk of Court should be directed to enter, by separate document, a judgment of dismissal.

3. A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT
## TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Mr. Caswell may object to this Findings and Recommendation within 14 days.[1] 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

Mr. Caswell must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address." Failure to do so may result in dismissal of this action without notice to him.

DATED this 3rd day of February, 2016.

Jeremiah C. Lynch
United States Magistrate Judge

---

[1] As this deadline allows a party to act within 14 days after the Findings and Recommendation is "served," Fed. R. Civ. P. 6(d) applies, and three days are added after the time would otherwise expire.